National Bank of Athens *vs.* Danforth *et al.* Denning, adm'r, *vs.* Danforth *et al.*

---

THE NATIONAL BANK OF ATHENS *vs.* DANFORTH *et al.*, and DENNING, administrator, *vs.* DANFORTH *et al.*

| | |
|---|---|
| 80a | 55 |
| 85 | 466 |
| 86 | 127 |
| 86 | 601 |
| 86 | 778 |
| 87 | 400 |
| 80 | 55 |
| 90 | 287 |
| 80 | 55 |
| 98 | 790 |
| 80 | 55 |
| 107 | 248 |
| 109 | 655 |
| 80 | 55 |
| f110 | 768 |
| 80 | 55 |
| 123 | 725 |
| 80 | 55 |
| 124 | 632 |
| 80 | 55 |
| f130 | 871 |

1. In taxing real property and collecting the taxes thereon, the public authorities may treat it as belonging indifferently, either to the *maker* or the *holder of a bond for titles* when the latter is in possession, but as between the parties to the bond, the one taking the rents and profits, or enjoying the use for the time being, is liable for the taxes.

2. Defects and irregularities in returning municipal taxes, and even omissions to return, are waived, and imperfect returns are cured, by pointing out property to be levied upon by virtue of a tax *fi. fa.*, the issuance of which presupposes returns duly made; and such waiver by the person assessed will affect others interested in the property taxed, but not beyond the unpaid taxes really due on the specific property.

3. Taxes on the mortgaged premises properly paid by the mortgagee to protect his security, are charges upon the property as against the mortgagor, and all persons holding or claiming under him by lien or purchase subsequent to the date of the mortgage; but taxes

not assessed on the specific property, though included in the same execution, and though paid by the mortgagee because so included, are not charges except as against the defendant in execution.

4. To render a tax execution available to a transferee as a strict legal lien, to affect others than the defendant therein, the execution must be entered on the proper execution docket within thirty days after the transfer; and an entry not disclosing the name of the plaintiff, but giving the transferee as plaintiff, and not indicating that the execution is for taxes, is insufficient to uphold the lien save as against the defendant.

5. The lien of a contractor or mechanic for improvements is not a charge upon the premises or the improvements as against prior liens or incumbrances put upon `the property by a previous owner, and duly recorded.

6. A *fi. fa.* issued upon a judgment rendered for a debt secured by a deed made under section 1969 of the code, cannot be levied upon the realty conveyed as security until after the creditor has executed, filed, and had recorded a deed reconveying the property to the debtor; and a sale by the sheriff to the creditor, the levy having been made after the execution of such deed, but before it was either filed or recorded, is utterly void.

7. The result is that the fund now in question, when realized, should be applied in order of priority as follows: First, to the mortgage *fi. fa.*, and so much of the tax *fi. fas.* as represent the taxes for the years 1883, 1884 and 1885 on this specific property, to be ascertained by multiplying the assessment by the rate for each year; secondly, to the judgment for the debt covered by the security deed; thirdly, the overplus, if any, to be treated as belonging to the ultimate owner of the fee (Mrs. Clayton), and as her property to be applied first, to the contractor's lien; secondly, to the residue of the tax *fi. fas.*; thirdly, the balance, if any, to be paid to her.

8. A contract to pay attorneys' fees for collecting, in addition to principal and interest, is not, on its face, usurious; nor does it become usurious by reducing the debt to judgment and including in the judgment ten per cent. for attorneys' fees.

November 15, 1888.

Equity. Taxes. Municipal corporations. Levy and sale. Waiver. Mortgages. Liens. Executions. Notice. Contractors. Debtor and creditor. Interest and usury. Attorneys' fees. Before Judge RONEY. Richmond superior court. April term, 1887.

The premises, consisting of a cotton warehouse in the city of Augusta, belonging to C. W. Clayton, were mort-

gaged by him to the National Bank of Athens, (White cashier,) in 1877, to secure a debt of $4,500 ; the mortgage was duly recorded. In October, 1883, by security deed under §1969 of the code, he conveyed, subject to the mortgage, to Mrs. Danforth, to secure a debt of $2,000, and she made to him a bond to reconvey upon payment of the debt; the deed recognized counsel fees as a part of the debt, in addition to principal and interest, and was duly recorded. In November, 1883, he conveyed the premises to Mrs. Clayton, his mother, and transferred to her the bond for titles made by Mrs Danforth. From September 1st, 1883, to the close of 1885, Mrs. Clayton, by her tenants, occupied the premises, and she received as rent $100 to $106.66 per month. In or about September, 1884, Denning, under employment by C. W. Clayton, which was afterwards ratified by Mrs. Clayton, constructed improvements to the amount of $600, by building fire-proof brick walls, dividing the warehouse into sections, and caused to be duly recorded a claim of lien on the premises as the property of C. W Clayton, and also a like claim on them as the property of Mrs. Clayton, the claims respectively being made by him as a contractor, mechanic and material man for work done and material furnished. A suit against Mrs. Clayton to enforce the lien was duly commenced and is still pending ; no suit was brought against C. W. Clayton. The improvements were proper and important ; they added materially to the rental value, the rents being, in fact, increased thereby and made continuous at the increased rate. In each of the years 1883, 1884 and 1885, a *fi. fa.* in favor of the city council of Augusta, for municipal taxes, was issued against Mrs. Clayton, none of the *fi. fas.* specifying any property as taxable, or out of which taxes were to be collected, but all being general *fi. fas. in personam* ; two of them were levied upon the premises. August 27th, and the other on October 3d, 1885. Pending an advertisement for sale under these levies, the attorney of Mrs. Danforth, the grantee in the security deed, by

letter to the cashier, gave notice to the bank of the levies and of the advertisement. The attorney of the bank went to Augusta, purchased the *fi. fas.*, and had them transferred to the bank by the proper officer of the city on November 5th, 1885, and within thirty days thereafter notice was given to Mrs. Clayton of the transfer, and the *fi. fas.* were entered on the proper execution docket as follows: "National Bank of Athens, plaintiff; Mrs. E. P. Clayton, defendant; amount $529.99," (the other two for $593.44 and $637.33, respectively, being entered in like terms). They were again entered on the same docket after the sheriff's sale under the *fi. fa.* of Mrs. Danforth, and after the thirty days from the date of transfer had expired, in which entry the city council of Augusta was set out as plaintiff and the bank as transferee. Mrs. Danforth, the creditor by security deed, having, on October 13th, 1885, obtained judgment upon her debt (including ten per cent. for attorneys' fees), reconveyed by deed to C. W. Clayton, her debtor, on January 6th, 1886, which deed was filed in the clerk's office, January 30th, and recorded February 1st, 1886; the premises were levied upon January 29th, 1886, (before the deed was either filed or recorded,) under a *fi. fa.* founded on the judgment, and were sold by the sheriff for $325 on April 6th, the creditor herself being the purchaser, to whom the sheriff made a deed, and she entered into possession. The tax *fi. fas.* were lodged by the bank to claim the money, and both the money and the *fi. fas.* are still in the sheriff's hands. The mortgage was foreclosed on the 28th of April, 1886, and a *fi. fa.* issued from the judgment of foreclosure, was levied upon the premises on May 1st thereafter. Pending an advertisement of sale under this levy, Mrs. Danforth filed the present bill against the sheriff, Mrs. Clayton, Denning, administrator of Denning (the contractor), the bank and its cashier, praying for general relief, and for an injunction to restrain the sale until the rank, dignity and validity of the respective liens could be de-

termined.  A restraining order was granted, which was still in force at the hearing.  The complainant sets up in the bill her security deed, her judgment, together with her title under the sheriff's sale.  She admits the sale was made subject to the mortgage, and offers to pay off the mortgage on condition of being protected in her title to the fee unincumbered  she claims priority over everything except the mortgage, characterizes the transfer of the tax *fi. fas.* as *pretended*, and applies the same epithet to the *fi. fas.* themselves; she urges against their validity that they were not properly issued, that they were not based upon returns made as by law required, nor as against specified property, but were issued as though Mrs. Clayton had actually returned specific property for taxation, when in fact she had not.  She contends that if the *fi. fas.* had a lien upon the premises, it was lost by claiming the proceeds of the sheriff's sale under the *fi. fa.* in her favor; also, that the *fi. fas.* embrace taxes on other realty of greater value than this, and therefore, that to pay the *fi. fas.* in full out of this would be to charge her with taxes on the other property ; also, that the bank, as to these *fi. fas.*, if they are a lien at all, has a lien upon two pieces of property, whilst she is confined to one, and therefore collection should be made out of the other; also, that Mrs. Clayton, having received the rents and profits, is properly chargeable with the taxes.  She alleges that her debtor is insolvent, and that she will lose her debt if not paid out of this property, and shows a return of *nulla bona* upon her *fi. fa.* against him.  She denies that the lien of Denning is superior to her title, but submits to the court whether it is superior to the lien of the mortgage.

The answer of the bank and its cashier insists that the tax *fi. fas.* were legally issued, and were proceeding to sell the premises when transferred; that they are liens on all the property of Mrs. Clayton, and their lien is not discharged by any sale, judicial or any other; that if the lien of Denning was against C. W. Clayton, it was discharged

as to the property and transferred to the fund raised by the sheriff's sale, and if against Mrs. Clayton, it is inferior to the mortgage, and in either case inferior to the liens for taxes. The answer prays that complainant be compelled to pay off the mortgage, and that the tax *fi. fas.* be decreed to be a lien on the premises, and on all other property of Mrs. Clayton, superior to all other liens. Denning, administrator of Denning, by his answer, insists that the improvements were valuable and necessary, the property being without value as a warehouse until they were made, and when made they added ten per cent. to its value, increased the rents, and the increased rents were realized by Mrs. Clayton· that the claim for making these improvements is in the nature of purchase money; and he prays a decree for $600 and interest, with the highest dignity.

By her answer, Mrs. Clayton admits the issuing of the tax *fi. fas.*, but disclaims knowledge of their regularity or legality, and calls for strict proof; she admits the *fi. fas.* were levied, says the city claimed taxes, was about to enforce the *fi. fas.*, and she pointed· out the premises to be levied upon, which were ample for payment; she denies that the rents received by her are liable, or that she by reason of receiving them is liable for taxes on the property; says that if the *fi. fas.* are liens at all they are superior to all other liens, and that the others were taken subject to their pre-eminence, but she insists that the *fi. fas.* are not liens, nor even claims, because not legally entered on the execution docket when or after transferred; she had two parcels of realty, this and another in which she had a life estate, and the taxes for each year were upon both together; that there is no authority to apportion the taxes, and payment on one parcel would not discharge it from the tax on the other. She prays that the *fi. fas.* may be decreed to have lost all lien and claim upon her property, to have been properly levied upon these premises and entitled to be enforced against the same, paid out of the proceeds, and rank as of the highest dignity.

By statute, municipal taxes assessed under the ordinances of the city of Augusta have a like lien and priority to State taxes, and rank next thereto. According to the ordinances of the city, each person liable to pay taxes is required to furnish the city sheriff and assessor with a written list, or return, of his taxable property, subscribed and sworn to. Those failing to make returns are subject to a fine for default, and their property is to be returned and assessed by the finance committee of council. The city sheriff and assessor is *ex-officio* a member of the board of assessors, composed of one member of council and one citizen from each ward. It is the duty of the sheriff and assessor annually to prepare a digest, or real estate book, and enter therein, by lot or parcel, all real estate, with the name of the owner, agent or representative, the precise location on or between streets, whether improved or not, leased or not, and from whom leased, the character of the improvements, the number of hydrants, and of families using each, together with any further information which will contribute to a full and equitable valuation. He must each year personally examine, and then value and assess, each lot or parcel, then submit his assessments to the board of assessors, who must revise, and if they deem proper, vary and correct the same. After the revision is completed, he must publish a notice that the assessments are open for ten days to inspection of persons interested; objections may be filed, and are to be acted upon; where no objection is made, the assessment is conclusive. The sheriff and assessor must report to council the amount and valuation of property returned for the year, and thereupon the rate of taxation is fixed by council. He must also prepare and deliver to the city collector and treasurer an alphabetical digest of the returns made to him. The lien attaches upon property owned on the first of January, and the returns should embrace the property owned, etc. by each tax-payer at that date, but as actually made, they seldom describe the realty otherwise than by reference to

the return of a previous year. The ordinances require notice by publication to be given of the time for paying taxes, and provide for execution to issue against all who fail to pay within the time allowed.

Upon the premises involved in the present litigation, Mrs. Clayton had paid the taxes for one or more years preceding the year 1883; they were known in the tax office as her property, and in 1883, 1884 and 1885, were assessed as hers at a valuation of $12,000; her other realty, in which she had a life estate only, and the legal title to which was in a trustee, was assessed at $16,000, and personalty amounting to $1,150 was also included in the assessment. Her return for 1883 was made by her husband, and specified no realty except by the word " same," meaning the same as the year preceding; that for 1884 was made by her son, and its language as to realty was, " Same as last year." For 1885, there was no return in writing, but Mrs. Clayton sent for the sheriff and assessor and instructed him orally to return her property the same as last year, and though no formal return was made, either by her or the assessor, her property was assessed upon both parcels of realty and the personalty, aggregated into one sum total, and the *fi. fa.* issued accordingly. This was done each year, the *fi. fa.* being against her *in personam*, and not specifying any property, or any kind of property, as the subject of taxation. The rate for the first year was 1.87½, for the second, 1.85, and for the third, 1.62½. The *fi. fas.* were levied under Mrs. Clayton's instructions to the officer, and upon the property which she pointed out, and of which she was then in possession. She neither then, nor previously, so far as appears, made any objection to the returns, to the assessments, to the amounts, or to anything else connected with the taxes or the *fi. fas.*

At the hearing, all these facts, save as to the lien for improvements, being undisputed, the court referred to the jury certain questions touching that lien, and the jury having found that the work was done by the contractor as

contractor, mechanic and material man, and that Mrs. Clayton ratified his employment, decreed that the premises be sold under the mortgage *fi. fa.*, and that the proceeds be applied first to that *fi. fa.*, next to the *fi. fa.* on the debt covered by the security deed, and the balance to the contractor's lien; declaring the tax *fi. fas.* invalid and not entitled to participate in the fund. The bank excepted to the decree for excluding the taxes; and the administra tor of the contractor excepted to it for not recognizing the lien as that of a mechanic; also for not ranking it as of the highest dignity, and attaching to the improvements without regard to the title.

L. & H. Cobb, A. J. Cobb, and J. H. Lumpkin, for the bank.

Foster & Lamar, for Mrs. Danforth.

Frank H. Miller and Wm. K. Miller, for Denning, administrator.

J. S. & W. T. Davidson, for Mrs. Clayton.

Bleckley, Chief Justice, (after stating the above facts.)

1. The first question involves the propriety of treating Mrs. Clayton as subject to be assessed for these taxes for three years. The evidence in the record (about which there is no dispute) indicates clearly that she had been in the habit of paying taxes upon this property prior to 1883. The property was known in the tax-office as hers; and although the conveyance to her was not made until No· vember, 1883, yet a return was made by her husband in that year, in which the reference to real estate was embraced simply in the word "same," which is interpreted by the evidence to mean the same as last year. We are not let into the actual return for 1882 to see how this property appeared there; but the indications are that,

either. in that return or some preceding one, this identical property was put down to Mrs. Clayton, and we so treat the fact. Mrs. Clayton was the holder both of an absolute deed conveying this property to her, and (by assignment) of the bond for titles which Mrs. Danforth had given, and was thus in the position both of an ordinary owner and the holder of a bond for titles for further conveyance and assurance of her title. With reference to the public, we hold that the assessment, in case of an outstanding bond for titles, where the holder of it is in possession of the premises, may be made either against such holder or against the maker of the bond, the person in whom the legal title rests for the time being; and a sale by the public authorities founded on an assessment against either would pass the title no doubt as against the other, if it were made for the taxes of that property alone; because it is no less the duty of the one than the other, relatively to the public, to pay taxes, or to see that they are paid. But as between themselves, it is very clear that the person who is in possession, enjoying the property itself or its rents and issues, ought to be charged, and is chargeable, with the taxes. If the vendor retains possession and gets his interest and income too, of course he ought to pay taxes. If the vendee takes possession and receives the income from the property, he ought to pay the taxes, the vendor being charged with taxes on the unpaid purchase money; and in this case, the whole of it is unpaid relatively to Mrs. Danforth, the maker of the bond for titles. The vendor, the holder of the legal title, with the purchase money wholly unpaid, does enough if he pays taxes upon the purchase money. The vendee, being in possession under the bond for titles, and receiving the income, or the use of the land, ought to pay the taxes. This is the law, and we so announce it in the first head-note. Therefore, as between Mrs. Danforth and Mrs. Clayton, Mrs. Danforth being the maker of the bond for titles, and Mrs. Clayton the holder, and in possession of the premises, Mrs. Clayton is chargeable with taxes.

2. But it is said that the tax executions are void, for irregularity. I have never known any documents covered with more sins than have been attributed to them. The only attack, however, upon them in the record, as original *fi. fas.*, without reference to the transfer, is that they were issued without due returns. If this property was included in the returns (however informal) for the three years, as it appears to have been, there *were* returns embracing this specific property. From the testimony of the tax officer, it is very rare that returns are made otherwise; and doubtless that is true. For the purposes of this case, we hold the reference to previous returns sufficient, especially as the returns have been ratified, and all irregularities, if any, acquiesced in by the person who is chargeable, legally and equitably, with the taxes for said years. As to the point that the deed conveying title to her, and the transfer of the bond, were not made until the latter part of the year, we attach no importance to that, because it was competent for her to return this property before she got the deed. She may have held it as agent, trustee or friend, for her son, in whom the title had previously been; and if she returned it and was assessed, the tax *fi. fa.* for that year, as well as for the others, issued properly against her.

But suppose there were irregularities, it was competent for her to ratify the returns as they were made, and thus to waive any trival objection, perhaps any grave objection, to them; and she appears to have acquiesced in the whole matter, made no objection to anything connected with it, and finally pointed out the property to be levied on, the very property that is now in controversy, and the levies were made accordingly, under her instructions; so the levying officer testifies.

As against all these other parties, this tax, if for the proper amount, the mortgagor and the mortgagee, the holder of the mechanic's lien and the holder of the security deed,—as against them all, it is a just and righteous tax, and it will and ought to affect them if it can be legally col-

lected out of the person against whom it was assessed, and the purport of the assessment as against her we have already shown.   She can make a waiver that will affect them, because of the fact that it is right and just and equitable for them to submit to the collection of these taxes out of this property.   It is as much an equitable and legal claim, relatively to the public, against the property with reference to them as it is with reference to her; and for that reason we allow her waiver to affect them.

3. Taxes on the mortgaged premises, properly paid by the mortgagee to protect his security, are charges upon the property as against the mortgagor, and all persons holding or claiming under him by lien or purchase subsequent to the date of the mortgage; but taxes not assessed on the specific property, though included in the same execution, and though paid by the mortgagee because so included, are not charges, except as against the defendant in execution.   This head of the case is controlled by the same principle involved in the preceding; the payment of these taxes by the mortgagee was properly made as to all the parties in the case.   The mortgagee finding his security endangered (and he had not yet foreclosed his mortgage), went forward under a notice communicated to him by the attorney of the holder of one of the other debts, and paid off the incumbrance.   In acting so, he acted for the benefit of all concerned.   These tax *fi. fas.* having the rank and dignity which the statute attributes to them, would have extinguished everything in front of them.   They would have cut down all these liens and claims upon the property had it been sold out as Mrs. Clayton's property.   It would have extinguished everything held by any of these claimants with regard to the property itself; and they would have been forced to go upon the fund, the proceeds, if there had been any, in excess of the payment of these taxes.   So the interposition of the mortgagee to protect his own security inured to the benefit of the whole, and no one, I apprehend, can doubt that the holder of an incum-

brance upon property, may protect it when it is threatened with a sale that will defeat his lien upon the property itself. He will not be forced to go upon the proceeds, especially before he has reduced his lien to judgment. The payment of these taxes, without any reference to whether the bank got a title to the executions by transfer, is an equity, a claim upon this property in the nature of expenses incurred for the benefit of all concerned; and taxes to that extent attach to the mortgage, and are to be paid with the mortgage out of the proceeds of the property.

4. This is our first judgment upon the construction which the act of the legislature in reference to transferring tax *fi. fas.* and entering them on the execution docket, ought to receive. Code, §891(a). No doubt the main purpose and policy of the statute was to protect purchasers and others who might become interested after the date of the transfer; but then there is policy in upholding registering as the legislature prescribes for it to be done; and there is no reason that we know of why one who becomes a transferee under the law should not comply with it; and if he fails to comply with it, we regard that as defeating him as the holder of a strict legal lien in his competition with everybody except the defendant. There is no indication in the statute of any purpose to serve the defendant by registering the transfer, or entering it upon the execution docket. The defendant cannot possibly be hurt by one going forward and paying taxes and taking a transfer; and the act of 1872 provided for the transfer itself, without putting it to any conditions about entering; and we think these *fi. fas.* are good in the hands of the bank as against Mrs. Clayton, the defendant, but they are not good as against others. The registry of them after the thirty days expired is a sort of voluntary act, and does not come under the statute applicable to this sort of transfer, as we understand it; but the point is not without some difficulty, because it does not appear that anybody here has been hurt. There has been no suffering. Nobody has acted in any

valid matter. There has been some action that was invalid after this transfer was made, but the respective interests of the parties are unchanged in this case since the transfers were made, as far as we can see. But it is better to stand by the statute than to fritter it away; it is better to let people who take tax *fi. fas.* register them as they are required to do, if they want to affect strangers by the transaction. At all events, we will set out on this line and maintain it until it is proved to be wrong. For my part, I think it perfectly sound, and I believe my brethren fully concur with me; but it is a new question, and there may not be that certainty about it which is desirable. It is the opinion we entertain now, and we so rule, as announced in the fourth head-note.

5. The lien of a contractor or mechanic for improvements is not a charge upon the premises or the improvements as against prior liens or incumbrances put upon the property by a previous owner, and duly recorded.

We once had a statute that gave mechanics, and perhaps contractors and material men also, liens upon improvements made without regard to title; but we think that statute was repealed by the lien law of 1873 (code, §§1979, 1980); and this work being done under the latter, we think it is governed by the general rule that he who performs labor and services of any sort, or furnishes material, has a claim against his debtor, and nobody else. As to any clear interest that Mrs. Clayton, who employed this contractor through her son, has in this property, the lien ought to be and will be protected; but Mrs. Clayton's contracts cannot retroact upon a prior title or prior liens put upon the property, not by her but by her son, the previous owner. It will be observed that there is no question in this case now as to the effect of this lien as a lien against her son, because he is not a party to this bill; and the claim of a lien as to him, although duly recorded, was apparently abandoned. No action within the twelve months was brought against him to the enforce it, or ever has been

brought so far as appears. When the mechanic did the work under employment by Mrs. Clayton, Mrs. Clayton as against Mrs. Danforth was simply the holder of a bond for title with the money upaid,—and the statute itself excepts that case—the mechanic's lien, is never good as against the purchase money, when the person who employed the mechanic holds only a bond for titles; and that was all Mrs. Clayton had as against Mrs. Danforth. The debt due to her was in the nature of purchase money; Mrs. Danforth, having taken the legal title as security and made a bond to reconvey on payment of that debt, the debt was in the nature of purchase money, relatively to any lien that Mrs. Clayton could put upon the premises; and so this mechanic's lien comes almost within the very words of the statute to postpone; it is not effective against Mrs. Danforth, the maker of the bond for titles. And to affect the mortgage by it would be to go back to the year 1877, and allow a mortgage of that date to be affected by work done on the premises in 1884; and if that were allowed, no creditor would ever know certainly what security he had, because very frequently the improvements eat up the improved; it takes more to pay for the work than the property was worth before the work was done, and sometimes more than the whole is worth after the work.

6. A *fi. fa.* issued upon a judgment rendered for a debt secured by a deed made under §1969 of the code, cannot be levied upon the realty conveyed as security until after the creditor has executed, filed and had recorded, a deed reconveying the property to the debtor; and a sale by the sheriff to the creditor, the levy having been made after the execution of such deed, but before it was either filed or recorded, is utterly void.

This, in effect, has been two or three times decided by the court, and it is the plain import of the statute. There is no right to levy in such a case until the deed is filed and recorded; indeed up to that time the estate is still in the creditor. The mere execution of the deed does not pass it

back so as to seize it as the property of the debtor, until the deed is delivered in the way prescribed by the statute, or in some other way; and here there was no delivery until the next day after this levy, and no recording until a day or two later. So that Mrs. Danforth, by the sheriff's sale she procured to be made, at which she was purchaser, took no right whatever, and her equities, if she had any, founded upon the theory that she was an innocent purchaser without notice of the transfer of these tax *fi. fas.* fall with her title. She is a mere creditor holding her security still. She finally put herself in a position to levy on the property, but she was not in that position at the time the levy was made.

7. The result is that the fund now in question, when realized, should be applied in order of priority as follows: First, to the mortgage *fi. fa.* and so much of the tax *fi. fas.* as represent the taxes for the years 1883, 1884 and 1885 on this specific property, to be ascertained by multiplying the assessment by the rate for each year; secondly, to the judgment for the debt covered by the security deed; thirdly, the overplus, if any, to be treated as belonging to the ultimate owner of the fee (Mrs. Clayton), and as her property to be applied, first, to the contractor's lien; secondly, to the residue of the tax *fi. fas.*, thirdly, the balance, if any, to be paid to her.

8. A contract to pay attorneys' fees for collecting, in addition to principal and interest, is not, on its face, usurious; nor does it become usurious by reducing the debt to judgment, and including in the judgment ten per cent. for attorneys' fees.

The law of Georgia recognizes the validity of such a stipulation, and it meets the justice of the case very frequently for the debtor to pay for the collection rather than the creditor. We confine this to the trial by inspection of the paper; we do not mean to intimate that usury might not be covered up by such a stipulation, that it might not be a disguise, or contrivance, for the conceal-

Gardner et al. vs. Donalson.

ment of usury; but there is no such indication in this case. There is no evidence that it was not a *bona fide* stipulation to cover the contingency of having to incur expense in collecting this debt.

Judgment in first case reversed, with direction; in second, affirmed.